**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **EP-10-CR-2159-KC** |
| | § | |
| **EDUARDO RODRIGUEZ-DAVALOS** | § | |

## ORDER

On this day, the Court considered Defendant Eduardo Rodriguez-Davalos's

("Defendant") Third Motion for Judgment of Acquittal, ECF No. 159. For the reasons set forth

herein, the Motion is **DENIED**.

## I.    BACKGROUND

On August 11, 2010, the grand jury sitting in El Paso, Texas returned an eight-count

Indictment charging Defendant with one count of Conspiracy to Commit Wire Fraud in violation

of 18 U.S.C. § 1349, two counts of Wire Fraud in violation of 18 U.S.C. § 1343, one count of

Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h), and four counts

of Money Laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(I). Indictment 1. These charges

stem from a loan transaction, which Defendant entered into with a Chancery Export Finance LLC

("Chancery"), a finance company located in Baltimore, Maryland, and which was guaranteed by

the Export Import Bank of the United States ("Export Import Bank"). Indictment 2-3.

A jury trial was held beginning on September 9, 2011, which ended in a mistrial on

September 22, 2011. On October 6, 2011, Defendant filed this "Third Motion for Judgment of

Acquittal" ("Motion").

## II.    DISCUSSION

### A.    Standard

"A motion for judgment of acquittal challenges the sufficiency of the evidence to convict." *United States v. Hope*, 487 F.3d 224, 227 (5th Cir. 2007) (quoting *United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005)) (internal quotation omitted).  In reviewing a motion for judgment of acquittal, the court considers whether a reasonable jury could find that the evidence presented established the essential elements of the crime charged beyond a reasonable doubt.  *See United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001) (citing *United States v. Scott*, 159 F.3d 916, 920 (5th Cir. 1998)).  "The standard does not require that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt."  *Id.* (citing *United States v. Baytank (Houston), Inc.*, 934 F.2d ,599 616 (5th Cir. 1991)).  Even when a jury fails to return a verdict, the Court may enter a judgment of acquittal.  Fed. R. Crim. P. 29(c)(2).

### B.    Sufficiency of the Evidence

Defendant argues that the Court should enter judgment of acquittal because the loan guarantee issued by the Export Import Bank was not money or property within the meaning of the wire fraud statute.  Mot. 1.  Defendant contends the object of the fraud scheme must be money or property in the hands of the victim.  Mot. 3 (citing *United States v. McMillan*, 600 F.3d 434, 448 (5th Cir. 2010)).  According to Defendant, the money or property at issue in this case is either the proceeds of the loan from Chancery or the Export Import Bank loan guarantee.  *Id.* at 3-4.  Because Chancery is not alleged to be the victim in this case, Defendant argues that the loan

proceeds cannot constitute money or property in the hands of the victim. *Id.* at 3-4. As for the

loan guarantee, Defendant states that it does not constitute money or property in the hands of the

Export Import Bank because the guarantees had no value to the Export Import Bank. *Id.* at 5

(citing *Cleveland v. United States*, 531 U.S. 12, 15 (2000)).

    The wire fraud statute prohibits use of wire, radio or television communication for "any

scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent

pretenses, representations, or promises." 18 U.S.C. § 1343. To prove wire fraud, the

government must prove a scheme to defraud, the use of wire communications, and a specific

intent to defraud. *See McMillan*, 600 F.3d at 450 (citing *United States v. Loney*, 959 F.2d 1332,

1337 (5th Cir. 1992)).[1] To "defraud" has the "common understanding of wronging one in his

property rights by dishonest methods or schemes, and usually signif[ies] the deprivation of

something of value by trick, deceit, chicane or overreaching." *Carpenter v. United States*, 484

U.S. 19, 27 (1987) (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987)) (internal

quotation marks omitted). Thus, the wire fraud statute protects property rights only. *Id.* at 25

(citing *McNally*, 483 U.S. at 360). Still, these protected property rights include rights in

intangible property. *See id.* Furthermore, though the misrepresentation need not be made

directly to the victim, and though the victim need not suffer financial loss, the "object of the

fraud [must] be money or property in the hands of the victim." *McMillan*, 600 F.3d at 449-50

(citing *United States v. Ratcliff*, 488 F.3d. 639, 645 (5th Cir. 2007); *Kreuter v. United States*, 218

---

[1]    The identical analysis is employed in wire fraud cases as in mail fraud cases.
*McMillan*, 600 F.3d at 447 n.24 (citing *Untied States v. Humphrey*, 104 F.3d 65,
70 n.3 (5th Cir. 1997)). Accordingly, this Court uses the case law
interchangeably.

F.2d 532, 535 (5th Cir. 1955); *Loney*, 959 F.2d at 1337).

In its Response to the Motion, the government does not dispute that Export Import Bank is the victim alleged in the Indictment. Resp. 6, ECF No. 160. Rather, the government contends that the Export Import loan guarantee is property in the hands of the Export Import Bank. *Id.* at 3-6. The Court agrees.

A loan guarantee by a United States agency is a property interest under the wire fraud statute because "it involves the Government's control over how its money is spent." *See United States v. Madeoy*, 912 F.2d 1486, 1492 (D.C. Cir. 1990) (quoting *McNally*, 482 U.S. at 360) (alteration and internal quotation marks omitted) ("[A]n FHA insurance commitment, by which the Government promises to pay the lender if the borrower defaults on the loan, is a 'property interest,' not an 'intangible right' under *McNally* and *Carpenter*."); *see also United States v. Catalfo*, 64 F.3d 1070, 1077 (7th Cir. 1995) (holding that depriving the victim "of the right to control its risk of loss[] had a real and substantial value"). The Export Import Bank loan guarantee is substantially similar in nature to the FHA "insurance commitment" of *Madeoy* in that both are promises by an agency of the United States to pay a private lender in the case of default by a borrower. *See Madeoy*, 912 F.2d at 1488; Mot. 3, 6. By allegedly providing false and fraudulent documents as part of the loan application in this case, Defendant diminished Export Import Bank's control over its risk of loss on the guarantee. *See Catalfo*, 64 F.3d at 1077.

The Second Circuit has explained that the "right to control" theory of liability under the wire fraud statute is based upon "a showing that some person or entity has been deprived of potentially valuable economic information." *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996) (quoting *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994)). "[T]he

4

withholding or inaccurate reporting of information that could impact on economic decisions can provide the basis for a mail fraud prosecution." *United States v. Wallach*, 935 F.2d 445, 463 (2d Cir. 1991); *see also United States v. Little*, 889 F.2d 1367, 1368-69 (5th Cir. 1989) (concealment of economically material information can constitute mail fraud).

In this case, the government introduced evidence at trial that to support the theory that Defendant provided false and fraudulent information regarding the loan guarantee impeding Export Import Bank's ability to control its risk exposure and its commitment "to pay back certain loans, which it would not otherwise have agreed to do." *See Madeoy*, 912 F.2d at 1492. Trial was replete with such evidence including the submission of blank purchase orders signed by Defendant and evidence that Defendant had paid money from his personal bank account to others who had provided the necessary documents to secure the loan guarantee from Export Import Bank. Further, the government introduced testimony by the former co-defendant Leopoldo Parra that Parra had explained to Defendant the procedures of obtaining Export Import Bank loan guarantees. There was, in fact, evidence at trial to support the government's theory that Defendant interfered with the Export Import Bank's property rights in the loan guarantee.

As another indication that the loan guarantee constitutes property under the statute, the loan guarantee had a value to the parties entering into the transaction: Plaintiff was willing to pay, and did pay, $17,500 for the loan guarantee and Export Import Bank was willing to sell, and did sell, the guarantee for this price. The Court recognizes that the Supreme Court held in *Cleveland v. United States* that paying money to the alleged victim of a wire fraud scheme does not in itself demonstrate the existence of a victim's property interest. *See Cleveland*, 531 U.S. at 22. Defendant argues as much. Mot. 4-5; Reply 3-4, ECF No. 162. However, the Court finds

*Cleveland* to be inapposite to this case.

In *Cleveland*, the Supreme Court held that state and municipal licenses "do not rank as 'property' for the purposes of § 1341, in the hands of the official licensor"; therefore, a fraudulent scheme to acquire the licenses does not fall within the purview of the mail fraud statute. *Cleveland*, 531 U.S. at 15. The Court explained "[i]t does not suffice . . . that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." *Id.* That the state of Louisiana collected an up front licensing fee for video poker licenses was of no moment. *Id.* at 21-22. Instead, the Court in *Cleveland* found that the state of Louisiana's interest in these video poker licenses was regulatory in nature, and these regulatory interests were "paradigmatic exercises of the States' traditional police powers." *Id.* at 21-23. The Court's concern was that allowing this reading of § 1341 would endorse "a sweeping expansion of federal criminal jurisdiction . . . . and would subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities." *Id.* at 24. The government's arguments in *Cleveland* – that the state of Louisiana's right to control the issuance of the licenses and to exclude certain licensees from this business constituted property interests – were unavailing because the state was acting in a governing and regulating capacity, and not in a business capacity. *Id.* at 24.

When issuing the loan guarantees involved in this case, Export Import Bank was not operating in a regulatory capacity. Although a government entity, it was acting as a business, making economic decisions based upon information provided to it, such as whether to enter into loan guarantees for a fee with a private lender on behalf of a private borrower. The loan guarantees involved the Export Import Bank making decisions about how its money would be

spent. *See Madeoy*, 912 F.2d at 1492. This guarantee did not implicate the police powers of the state nor analogous powers of the United States. *Cf. Cleveland*, 531 U.S. at 21-23. Accordingly, contrary to Defendant's assertions, *Cleveland* is not controlling in this case.

## III. CONCLUSION

Because the loan guarantee constitutes property under the wire fraud statute and because the government introduced sufficient evidence at trial that Defendant schemed to defraud the Export Import Bank of that property by submitting false and fraudulent loan information, the Motion is **DENIED**.

**SO ORDERED**.

**SIGNED** on this 10th day of November, 2011.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE